[Crim. No. 1071. Third Appellate District.—May 24, 1929.]

THE PEOPLE, Respondent, v. ALI HAKAM, Appellant.

H. W. McGowan and S. Luke Howe for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THOMPSON (R. L.), J.—The defendant was convicted of an assault with a deadly weapon. It is contended that the verdict is not supported by the evidence, and that the defendant was prejudiced by the admission of incompetent evidence which tended to prove another offense against him. We are of the opinion that the evidence amply supports the verdict. The defendant Ali Hakam is a native of Afghanistan. Together with a fellow countryman, he was engaged in harvesting a crop of rice on the Spaulding ranch in Glenn County, California. For this purpose they had employed the prosecuting witness, Ben L. Blackburn and his two cousins. September 14, 1928, they were engaged in cutting and binding the grain. About 4 o'clock in the afternoon, while Blackburn was driving a Fordson tractor, the defendant visited the vicinity in his automobile, and taking a shovel on his shoulder crossed the field and intercepted the tractor, where he accosted the prosecuting witness, severely criticising the character of his work and inquiring in sarcasm if that was the best work he could do. A controversy followed, during which time Blackburn remained seated on the tractor while the defendant stood near by with his shovel in hand. Both individuals became angry. The prosecuting witness finally said: "If you don't like the way we're cutting the rice, go to the house and come back down here and pay us off." He also asked the defendant

why he did not get Mr. Boyd, who was the general manager of the Spaulding ranch, to come down and talk to him. To the latter remark the defendant replied that Boyd was not the boss and he did not have to get him. After a somewhat heated dispute over the character of the work the defendant wrathfully told Blackburn to go on and finish his work and that he would get no pay until he had completed it. The defendant testified that Blackburn said: "You go to h—1. . . . Go and tell Mr. Boyd (to) come and talk to us—not your black face." In anger the defendant then raised his shovel and struck at Blackburn, missing him and striking the tractor. The prosecuting witness immediately sprang from his seat to the side of the tractor opposite from which the defendant stood, and seizing an iron pinchbar about two feet in length he followed the defendant, who slowly retreated for a distance of ten or fifteen feet. No further blow was struck, however, in this feature of the encounter. After a few moments of such threatening demonstrations, the defendant said: "That's all right, you stay here, I go to the house—I come back." He then crossed the field in the direction of "Camp 7," where he lived. Blackburn resumed his place on the tractor and continued cutting the rice. After an absence of half or three-quarters of an hour, with barely time to complete the journey, he again drove down the Norman road to a point opposite that part of the rice field where Blackburn and his cousins were engaged in working, and this time without the protection of his shovel, again crossed over and intercepted the prosecuting witness, who was still seated on his tractor. As the defendant approached his hand was concealed beneath the bib of his overalls. The prosecuting witness said: "I told him I knew he had a gun; if he would lay it on the Fordson we would settle our affair with our fists. . . . He said, 'You want to settle with me, do you?' And he pulled out the gun and started shooting. Q. Where did he pull the gun from? A. Under the bib of his overalls." The defendant then stood only five or ten feet from the tractor. The prosecuting witness was unarmed. He sprang from the tractor and rushed upon the defendant, who fired at him but missed his mark. Mr. Blackburn testified in this regard:

"He pulled the gun like that (indicating) and shot, see. And he missed. Then I grabbed the gun—he had it stuck in my stomach like that (indicating), see; and I threw it up. The next shot hit me in the shoulder; and threw it (me) down, and shot me in the stomach, and I do not know when I got this one in the arm here (indicating). . . . Q. He missed you, but the next shot you say struck you in the shoulder? A. Yes. Q. What was the effect of that shot? A. It knocked me down. . . . Q. . . . When do you say that you received the wound in your stomach? A. When I was lying on the ground."

At the time this affray occurred both cousins of Blackburn witnessed the encounter from a distance of about 100 to 150 yards and corroborate the material parts of his testimony. The defendant used a 32-caliber revolver which was concealed beneath the bib of his overalls and he fired four or five shots, three of which took effect in the body of the prosecuting witness, one penetrating the shoulder, another entering the abdomen below the ribs and a third passing through the fleshy portion of his arm. In spite of the serious wounds which were inflicted upon him the prosecuting witness managed to get upon his feet and run toward his cousins for aid. The defendant then returned to his automobile and reloaded his revolver with cartridges, a supply of which he kept in the machine. Blackburn was taken to a hospital seriously injured, but finally recovered.

The defendant claims that he returned to "Camp 7" after the first conflict to get Mr. Boyd, but failing to find him that he again returned to the rice field to inspect the character of the cutting of the grain. In spite of the fact that he saw the son of Mr. Boyd at the house he failed to inquire as to the whereabouts of his father. He does not pretend that he went after money with which to pay the employees with the object of discharging them. Indeed, he told Mr. Blackburn he would not pay him until his contract was completed. He returned to the field as quickly as one could reasonably make the trip to and from the house, which was a distance of more than a mile. The jury had a right to assume that if he had gone to get Mr. Boyd he would have at least inquired for him from his son, and that if he were returning with the object of again inspecting the cutting of the rice he could have done so in any other portion

of the field than the particular place where Blackburn was working with his tractor. It seems unreasonable to believe that he would immediately return to the presence of the individual with whom he had just had so serious a conflict, for the mere purpose of inspecting the cutting of the rice. In spite of the fact that the defendant testified that he had the revolver with him upon the occasion of the first controversy, the jury may have reasonably believed, from the surrounding circumstances, that he went to his home for the purpose of arming himself, and that he deliberately returned, intercepting Blackburn, and renewed the affray. It is true that the defendant contradicts the material parts of the foregoing story, claiming that he acted solely in self-defense. Three witnesses, however, corroborate Blackburn's version of the affray, which appears to be supported by the weight of evidence.

It is true that the prosecution called three witnesses by each of whom they proved, over the objection of the defense, that the defendant never procured a license to carry a concealed revolver. No valid excuse was offered for the introduction of this testimony, except a statement by the district attorney that "we submit we are in our legal rights in making the proof." The defendant objected to this testimony on the ground that it was incompetent, and that it tended to prove another offense against the defendant. This objection should have been sustained. The evidence was incompetent and had no application to the offense with which the defendant was charged. The California Deadly Weapon Act (1 Deering's Gen. Laws, 1923, p. 663, No. 1970) makes it a misdemeanor for any person, native citizen or foreign born, to carry a concealed revolver upon the person without having procured a license so to do. The same act also makes it a misdemeanor for an unnaturalized alien to have in his possession a revolver or other firearm capable of being concealed on his person, regardless of whether he has procured a permit or not. (*People* v. *Quarez,* 196 Cal. 404 [238 Pac. 363].) In proof of the particular crime with which the defendant was charged, it became essential to show that he carried a revolver upon his person. It is true that the concealing of a revolver upon the person, whether naturalized citizen or foreign born without having procured a license so to do, is a misdemeanor distinct from

the crime with which the defendant was charged. The gist of this statutory offense is to have a revolver on one's person without a license for its possession. This offense is merely *malum prohibitum* and not *malum in se*. The only objectionable element of this offense which was not necessary to prove the crime with which the defendant was charged was the lack of a license. Nowhere in the evidence adduced, the instructions given or the argument of counsel was the separate offense referred to, except in the objection to the introduction of the evidence which was made by the defendant. Under the circumstances we are of the opinion that the admission of this testimony considered in the light of article VI, section 4½, of the Constitution of California, was not prejudicial error.

The appellant charges the district attorney with prejudicial misconduct in the use of the following language in the course of his argument to the jury: "You will not give to him (the defendant) the right to settle his civil differences by force of arms, any more than you would arrogate to yourselves the right to settle your civil matters by giving and making a murderous assault upon a man with whom you had some business differences. It was that hot seething blood, which was incubated in some other country, which has not cooled by association with the calmer peoples of the Western World, that was in his mind at the time that he went out and he had this talk with this boy." This argument, however, had no reference to the charge of the commission of another offense, but was made in response to the argument on the part of defendant's counsel in his plea for justice toward his client to whom he referred as a foreign-born native of Afghanistan. The language of the district attorney may have been extravagant and unwarranted, although it had a reasonable reference to the temperament which one might presume that a man possessed who acted as the defendant did under the circumstances of this case. Moreover, at the request of the defendant, the court promptly charged the jury to disregard this language, saying: "The jury of course understands a man of any other race would be entitled to the same trial an American would be, and so far as the remarks made on the matter, you will disregard the remarks of counsel."

We are of the opinion that the foregoing remarks of the district attorney were not prejudicial and that they did not constitute misconduct on his part.

The judgment and the order are affirmed.

Plummer, J., and Finch, P. J., concurred.